# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**AMHURST BROWN III**
        **Plaintiff,**

    v.                                                              Case No. 13-C-262

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

Plaintiff Amhurst Brown applied for social security benefits, alleging disability due to a variety of impairments including back, neck, and knee pain, an injured finger on his right hand, a torn Achilles tendon, diabetes, and obesity. (Tr. at 135, 159.) The Social Security Administration ("SSA") denied his claim initially (Tr. at 76) and on reconsideration (Tr. at 77), as did an Administrative Law Judge ("ALJ") following a hearing. After the Appeals Council denied review (Tr. at 1), the ALJ's decision became the final word from the Commissioner of Social Security on plaintiff's claim. Shauger v. Astrue, 675 F.3d 690, 695 (7th Cir. 2012). Plaintiff now seeks judicial review.

## I. STANDARD OF REVIEW

The court reviews an ALJ's decision to ensure that she applied the correct legal standards and supported the decision with substantial evidence. Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Pepper v. Colvin, 712 F.3d 351, 361-62 (7th Cir. 2013). The court may not, under this deferential standard, re-weigh the evidence

or substitute its judgment for the ALJ's. Id. at 362. The court must nonetheless conduct a critical review of the record, ensuring that the ALJ adequately discussed the issues and built an accurate and logical bridge from the evidence to her conclusion. McKinzey v. Astrue, 641 F.3d 884, 889 (7th Cir. 2011). Because judicial review is confined to the reasons stated by the ALJ, the court may not consider post-hoc justifications for the denial offered by the Commissioner's lawyers. Hunt v. Astrue, 889 F. Supp. 2d 1129, 1133 (E.D. Wis. 2012). Finally, if the ALJ commits an error of law the court may reverse without regard to the volume of evidence in support of the factual findings. Id. Among those legal standards with which the ALJ must comply are the Commissioner's Social Security Rulings ("SSR"), which are "binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1); see also Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Medical Problems

In March of 2008, plaintiff injured his right Achilles tendon playing basketball. (Tr. at 352-53.) After years of delay, some apparently due to concerns about plaintiff's poorly controlled diabetes and the strength of his heart (Tr. at 284, 295-97, 298-99, 301), he underwent surgical repair in May of 2011, from which he was still in the process of recovering at the time of the hearing before the ALJ (Tr. at 58-59, 61-62, 349-50, 408-09, 412).

In September of 2008, plaintiff sustained a mallet injury to his right ring finger[1] and lacerations to the left forearm in a motor vehicle accident. The wounds to his left arm healed

---

[1]A Mallet injury occurs when a person cannot, due to an injured tendon, fully straighten his finger. The tip of the finger remains bent down toward the palm. See http://www.nlm.nih.gov/medlineplus/ency/patientinstructions/000538.htm.

2

well, but he continued to experience problems with the finger, which never fully straightened and diminished his grip strength. (Tr. at 213-14, 215, 227-32, 234-35.) Plaintiff also complained of neck pain and back stiffness following the accident. (Tr. at 247-50.) Scans of his cervical spine taken in December 2008 showed no evidence of fracture, mal-alignment, or instability, with very mild degenerative disc disease at C6-7; scans of the lumbar spine likewise showed no fracture, mal-alignment, or instability, with very mild degenerative changes at L3-4 and L4-5. (Tr. at 221-24.) Subsequent scans from 2010 revealed further degeneration, however. Specifically, an April 23, 2010 CT scan of the lumbar spine revealed modest degenerative changes, most pronounced at the L3-4 and L4-5 levels. (Tr. at 364-65.) An April 27, 2010, MRI of the lumbar spine revealed dessication of the L3-4 and L4-5 discs and facet degeneration at L3-4, L4-5, and L5-S1. (Tr. at 276.)

Plaintiff also complained of chronic left leg pain secondary to a gunshot wound circa 2006. (Tr. at 283.) In March 2010, he saw Dr. Anjum Razzaq, a neurologist, for consultation regarding left leg numbness. (Tr. at 292.) Dr. Razzaq ordered EMG and nerve conduction studies, which revealed left lateral femoral cutaneous neuropathy. (Tr. at 287-88, 294.) Dr. Razzaq suspected that plaintiff's neuropathy was secondary to his being obese, with his poorly controlled diabetes also a possible contributing factor. Dr. Razzaq also suspected a possible auto-immune disorder based on plaintiff's elevated ANA level, referring plaintiff for a rheumatology consult. Dr. Razzaq prescribed Lyrica and Lidoderm patches, but plaintiff complained that the Lyrica made him feel "weird," so he stopped taking it, and the Lidoderm patches were not covered by his insurance. (Tr. at 289, 290.)

Also in March 2010, plaintiff began receiving treatment from Advanced Pain Management for leg, knee, back, and neck pain. (Tr. at 359.) Dr. Nosheen Hasan attributed

3

the pain to degenerative disc and joint disease, diabetic neuropathy, and myofascial syndrome, prescribing medications including Oxycodone, Percocet, Flexeril, Ambien, Gabapentin, Cyclobenzaprine, and Topamax. (Tr. at 360-63, 368-72, 376-83, 388-92, 399-400, 404-05, 408-09.) Dr. Hasan's examinations revealed that plaintiff's muscle strength and tone was 4/5 in the upper and lower extremities. (Tr. at 366-67, 393-94, 395-96, 397.)

On September 3, 2010, Dr. Bridgett Moss, plaintiff's primary care physician, wrote a note indicating that plaintiff had chronic low back pain and was restricted to sitting and standing over one hour and lifting over ten pounds. She stated: "[Plaintiff] may work as tolerated." (Tr. at 415.) On December 6, 2010, Dr. Moss completed a physical residual functional capacity ("RFC") questionnaire, listing a diagnosis of low back pain for which plaintiff took pain medication, which made him drowsy. (Tr. at 323.) Dr. Moss opined that plaintiff's pain frequently interfered with the attention and concentration needed to perform even simple work tasks. He was capable of low stress jobs but became angry with increased stress. He could walk one block without rest or severe pain, sit for thirty minutes, and stand for five minutes. (Tr. at 324.) In an eight hour workday, he could sit and stand/walk less than two hours. He required a job that permitted shifting positions at will, as well as ten or more unscheduled breaks of ten to fifteen minute duration during an eight-hour workday. He could occasionally lift ten pounds, rarely twenty, never more. (Tr. at 325.) He could never stoop, crouch/squat, climb ladders or stairs. He also had significant limitations in reaching, handling, and fingering, particularly on the right. Finally, his impairments would cause good and bad days, such that he would be absent more than four times per month. (Tr. at 326.)

**B.    Consultants' Reports**

After plaintiff filed his social security applications, the SSA arranged for evaluation of his

4

claim by several consultants. On January 26, 2010, Dr. Scott Hicks performed a consultative orthopedic examination, finding plaintiff cooperative, able to get about the room without an assistive device, and able to get off of the exam chair and onto the table without much difficulty, although he did walk with an antalgic gait favoring his left side. Examination of his upper extremities revealed full range of motion in his neck, shoulders, elbows, and wrists. He did have mallet finger deformity of his right long finger, which could be passively straightened and was non-tender. Examination of the back revealed that plaintiff could forward bend and touch his distal tibia; he could extend 20 degrees and had negative straight leg raise bilaterally. Examination of his lower extremities revealed palpable deformity of the right Achilles tendon. He was able to plantar flex without difficulty but did have difficulty rising up on his toes, particularly on that side. Examination of the left knee revealed full range of motion with no significant effusion or swelling. He had mild tenderness to palpation over his medial joint line. Radiographs of the left knee revealed mild medial joint space loss with a bullet fragment noted in the posterolateral aspect. He otherwise had good alignment and no significant deformity. (Tr. at 260.) Dr. Hicks recommended that plaintiff take anti-inflammatory medication for arthritic changes and receive physical therapy for his weak Achilles tendon. His mallet finger was well-healed, and the deformity should not limit him in any significant activities. Dr. Hicks indicated that plaintiff should avoid heavy lifting, climbing, and walking as this could exacerbate his knee pain; he also had some weakness in the right lower extremity. (Tr. at 260.)

On February 11, 2010, Dr. Syd Foster completed a physical RFC assessment report, listing diagnoses of morbid obesity, mild degenerative joint disease of the left knee, and a history of Achilles tendon rupture. (Tr. at 262, 269.) Dr. Foster found plaintiff capable of medium work with occasional climbing. (Tr. at 263-64, 267.)

5

On August 10, 2010, Dr. Mina Khorshidi completed a second physical RFC assessment report, finding plaintiff far more limited. (Tr. at 309-13.) Taking into account plaintiff's morbid obesity, right Achilles tendon injury, left femoral neuropathy, mild left knee arthritis, and back pain, Dr. Khorshidi set an RFC for sedentary work with occasional kneeling, crouching, and crawling. She also imposed a heights/hazards restriction secondary to plaintiff's hypertension and diabetes. (Tr. at 316.)

**C.    Hearing Before the ALJ**

On July 20, 2011, plaintiff appeared with counsel for his hearing before the ALJ. The ALJ also summoned a vocational expert ("VE").

Plaintiff testified that he was forty-six years old, 6' tall and 290 pounds, with an eleventh grade education. (Tr. at 44-45.) He indicated that he last worked in March 2008 delivering pizzas before he went to jail for violating terms of his probation. (Tr. at 46-47.) He indicated that he supported himself through gambling and help from his girlfriend and sister. (Tr. at 49.)

Plaintiff testified that he took various medications, including Oxycontin for pain, Gabapentin for nerve pain, Cyclopenzaprine as a muscle relaxer, Ambien for sleep, and insulin for his diabetes; he had taken Lisinopril for high blood pressure, but his doctor allowed him to stop because his blood pressure had been under control. (Tr. at 49-50.) He indicated that the medications made him drowsy. (Tr. at 51.)

Plaintiff testified that he felt pain in his lower back, neck, right hand and arm, and left knee. (Tr. at 51.) Due to the injuries he sustained in the car accident, he could not make a tight fist with his right hand and experienced problems with his grip. (Tr. at 52.) He also complained of arthritis in his left knee, which bothered him when climbing stairs. He testified that he recently had surgery on his right Achilles tendon, after which he used crutches and then

6

a cane; he had not used these assistive devices prior to the surgery. (Tr. at 54, 62.)

Plaintiff testified that on a typical day he awoke, checked his blood sugar, took his medication, ate breakfast, watched TV, and slept. (Tr. at 54.) He was able to care for his personal needs but could not stand too long to wash dishes because of back pain and balance problems. His mother helped him with laundry, and he denied doing much in the way of house cleaning or outside chores. If he went to the grocery store, he bought just a few items. (Tr. at 55-56.) Because he could not drive, his mother dropped him off for the hearing. As for social activities, plaintiff indicated that he played two games of pool on Sundays in a league; he denied other activities. (Tr. at 56.)

Plaintiff testified that he could sit for about twenty to thirty minutes before he had to stand; he could not stand for a long time either due to balance problems. He could lift a carton of milk and walk a couple blocks. (Tr. at 65.) He indicated that he frequently sat down while playing his weekly pool games. (Tr. at 66.) He also complained of neuropathy or numbness above his left knee, which affected his ability to walk and climb stairs. (Tr. at 67-68.)

The ALJ then turned to the VE, asking a hypothetical question assuming a person capable of medium work, with no climbing, balancing, working at heights or hazards, kneeling or crawling; occasional stooping and crouching; and able to use the right hand on a frequent but not constant basis. (Tr. at 71.) The VE testified that such a person could perform plaintiff's past pizza delivery job, as well as other jobs such as medium production inspector, machine feeder, and janitorial positions; light production inspector, machine feeder, delivery driver, food processor, and housekeeping positions; and sedentary production inspector, machine feeder, security guard monitor, and cashier. (Tr. at 71-72.) If the person needed to alternate positions from seated to standing at will, the medium jobs would be eliminated, about 10% of the light

7

jobs would remain, and all of the sedentary jobs would remain in the same numbers. (Tr. at 72.)

Plaintiff's counsel asked a hypothetical question, assuming a person requiring a sit/stand option, with little to no use of the dominant hand, no more than ten pounds lifting, no overhead reaching, and missing half a day to a full day per month for doctor's appointments. The VE indicated that the sedentary security guard monitor and cashier jobs could still be done. Adding no stooping, crouching, squatting, climbing, or hazards of any sort, those two jobs would remain. (Tr. at 73.) If the person needed to take frequent breaks – up to ten times per day – in addition to normally scheduled breaks, if this resulted in the person being off task more than 10% of the day he could not maintain competitive employment. (Tr. at 73-74.) If the person missed two days per month due to pain or medical appointments, no jobs would exist. If the person could only sit two hours per day, the sedentary jobs could still be done, as those positions can be done from a seated or standing position. However, if the person could only stand two hours per day as well, there would be no full-time competitive employment. (Tr. at 74.)

**D.    ALJ's Decision**

On October 28, 2011, the ALJ issued an unfavorable decision. Following the familiar five-step process, see 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a), the ALJ determined that plaintiff had not worked since the application date (step one), and that he had the following severe impairments (step two): Achilles tendon rupture, mallet injury to the right long finger, cervical and lumbar degenerative disc disease, degenerative joint disease in the left knee, left femoral neuropathy, diabetes mellitus, and obesity. (Tr. at 14.) At step three, the ALJ found that none of these impairments qualified as conclusively disabling under the Listings. (Tr. at

8

14-15.)

The ALJ then determined that plaintiff retained the RFC to perform light work, limited to jobs that allowed a sit/stand option, with no more than occasional stooping or crawling. The ALJ further found that plaintiff was restricted from climbing, balancing, or exposure to heights. Finally, he was limited to frequent (as opposed to constant) use of his right hand. The ALJ rejected plaintiff's testimony and Dr. Moss's report suggesting greater limitations. (Tr. at 15-17.)

As plaintiff had no past relevant work (Tr. at 17), the ALJ skipped from step four to step step five, where, considering plaintiff's age, education, work experience, and RFC, she found that he could perform other jobs in the national economy (Tr. at 18). Specifically, the ALJ cited the VE's testimony that a person with plaintiff's characteristics could work as an inspector, machine feeder, and food processor. (Tr. at 18.) The ALJ thus found plaintiff not disabled. (Tr. at 18-19.)

### III. DISCUSSION

Plaintiff argues that the ALJ erred in evaluating credibility, the medical opinion evidence, and, ultimately, RFC. He also contends that the ALJ cited the wrong Listings at step three. I agree that the ALJ erred in considering credibility and the medical opinions, and that those errors infected the RFC determination. The matter must therefore be remanded. On remand, the ALJ can clear up any step three confusion.

**A.    Credibility**

   **1.    Applicable Legal Standards**

"In evaluating the credibility of statements supporting a Social Security application, . .

9

. an ALJ must comply with the requirements of Social Security Ruling 96-7p." Giles ex rel. Giles v. Astrue, 483 F.3d 483, 488 (7th Cir. 2007). That Ruling directs the ALJ to first determine whether the claimant suffers from medically determinable impairments that could reasonably be expected to produce the pain or other symptoms the claimant contends disable him. If he has no such impairments, the alleged symptoms cannot be found to affect his ability to work. If such impairments are shown, however, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's ability to work. SSR 96-7p, 1996 WL 374186, at *2. In making this determination, the ALJ may not reject the claimant's testimony solely because his symptoms are not fully substantiated by medical evidence. Id.; see also Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009). This is so because pain, fatigue, or other subjective complaints can be severe and disabling even in the absence of "objective" medical substantiation. Carradine v. Barnhart, 360 F.3d 751, 753 (7th Cir. 2004). Accordingly, once the claimant produces medical evidence of an underlying impairment, the ALJ must evaluate the claimant's statements based on the entire record, considering, in addition to the medical evidence, (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p, 1996 WL 374186, at *3.

After considering these factors, the ALJ must provide specific reasons for her credibility determination, supported by the evidence in the case record. Id. at *4. On judicial review, the court gives the ALJ's credibility determination special, but not unlimited, deference; the ALJ must consider the SSR 96-7p factors, and she must support her findings with evidence in the record. Shauger, 675 F.3d at 696.

**2. Analysis**

In this case, the ALJ started with the SSA's ubiquitous credibility template:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 16.) The first clause of the template purports to follow SSR 96-7p's two step process, but the second clause misapprehends why a claimant's statements even matter. As the cases recognize, pain, fatigue, or other symptoms can be disabling (so long as they arise from a medically determinable impairment), see, e.g., Carradine, 360 F.3d at 753, so it makes no sense to first determine a claimant's ability to work and then match the claimant's statements against that determination, rather than evaluating credibility as an initial matter in order to come to a decision on the ultimate question of work capacity. Hunt, 889 F. Supp. 2d at 1147; see also Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012) ("[T]he assessment of a claimant's ability to work will often (and in the present case) depend heavily on the credibility of her statements concerning the 'intensity, persistence and limiting effects' of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.").

11

Despite strong criticism of the template, the Seventh Circuit has declined to adopt a per se rule of reversal. If the ALJ otherwise explains her conclusion adequately, offering specific reasons grounded in the evidence, use of the template can be harmless. Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012). In the present case, the ALJ provided two specific reasons for finding plaintiff's claim of total disability unconvincing. However, both run afoul of well-settled law.

First, the ALJ stated that the "medical record does not fully substantiate [plaintiff's] allegations." (Tr. at 16.) The problem with this observation is that, once he established impairments that could produce pain or other symptoms, plaintiff was not required to fully substantiate his allegations with objective medical evidence. See, e.g., Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009); Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001). This does not mean that an ALJ is forbidden from comparing the claimant's allegations to the medical evidence, see, e.g., Simila v. Astrue, 573 F.3d 503, 519 (7th Cir. 2009), but she may not reflexively reject a claimant's statements on this basis.

Moreover, the ALJ's analysis in this case was incomplete. In finding the medical evidence inconsistent with plaintiff's claims, the ALJ referred to diagnostic imaging of his lumbar and cervical spine revealing only mild abnormalities, and an x-ray of his left knee showing only mild joint space loss. (Tr. at 16-17.) As plaintiff notes, however, the April 23, 2010, CT scan documented "modest degenerative changes in the lumbar spine" (Tr. at 365) and his April 27, 2010 MRI demonstrated dessication of the L3-4 and L4-5 discs and facet degeneration at L3-4, L4-5, and L5-S1 bilaterally. (Tr. at 276.)

The ALJ also noted that the consultative examiner, Dr. Hicks, found that plaintiff remained able to ambulate without an assistive device, and he was able to get on and off of

12

the exam table without significant difficulty. (Tr. at 17.) However, prior to his Achilles tendon surgery, plaintiff did not claim that he needed a cane, walker, or crutches (Tr. at 62, 175, 412), so it is hard to see how this impacts his credibility. The ALJ otherwise failed to explain how plaintiff's ability to walk across the exam room (with an antalgic gait) undermined his credibility.

In defending the ALJ's credibility determination, the Commissioner indicates that the ALJ properly considered plaintiff's very sporadic and limited treatment history. The ALJ made no such observation in discussing credibility, and judicial review is confined to the reasons the ALJ supplied. Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002). In any event, this argument overlooks plaintiff's regular treatment at a pain clinic, including prescriptions for various pain relievers and muscle relaxants.

Second, the ALJ relied on what she characterized as plaintiff's "significant level of remaining daily activity," including preparing meals, cleaning his home, driving an automobile, babysitting his niece, and playing two games of pool in a bar on Sundays in a league. (Tr. at 17.) While SSR 96-7 directs the ALJ to consider a claimant's daily activities as part of the analysis, she must do so with care. Roddy, 705 F.3d at 639. For one thing, the ALJ must appreciate the critical differences between activities of daily living and activities in a full-time job. A person has more flexibility in scheduling the former than the latter, can get help from others, and is not held to a minimum standard of performance as he would be by an employer. Bjornson, 671 F.3d at 647; see also Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."). Further, the ALJ must explain why particular activities undercut the claimant's credibility; it is not enough to simply list various chores, declare them "significant,"

13

and then find the claimant incredible. See, e.g., Jelinek v. Astrue, 662 F.3d 805, 812 (7th Cir. 2011) ("An ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence.") (internal citation omitted); Stewart v. Astrue, 561 F.3d 679, 684 (7th Cir. 2009) ("For example, the ALJ mentions Stewart's ability to cook, clean, do laundry, and vacuum at her home, but those activities do not necessarily establish that a person is capable of engaging in substantial physical activity."); Villano, 556 F.3d at 562 ("Although [the ALJ] briefly described Villano's testimony about her daily activities, he did not, for example, explain whether Villano's daily activities were consistent or inconsistent with the pain and limitations she claimed."); Zurawski, 245 F.3d at 887 ("While the ALJ did list Zurawski's daily activities, those activities are fairly restricted (e.g., washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain."); Mason v. Barnhart, 325 F. Supp. 2d 885, 903-05 (E.D. Wis. 2004) (reversing where the ALJ based his credibility determination on activities such as performing self-care, driving, shopping, watching TV, cooking simple meals, and visiting with family and neighbors).

In this case, in addition to offering no more than a list of activities, the ALJ overlooked plaintiff's testimony regarding his limitations in those activities. For instance, he indicated that he made simple meals, like sandwiches; he washed few dishes because he could not stand at the sink very long; his mother, niece, and nephew helped with the laundry; he did little cleaning and no yard work; and he bought just a few items at the grocery store. (Tr. at 55-56, 171.) In a pre-hearing report, plaintiff indicated that he could drive a car (Tr. at 172), but when the ALJ asked him at the hearing if he drove, plaintiff responded, "I can't." (Tr. at 56.) Plaintiff testified that he used to play a lot of pool, but now he played only two games on Sunday. (Tr.

14

at 56, 66.) He further explained that he did a lot of sitting during the games; "I'm not up around the table a lot." (Tr. at 66.) Regarding his niece, plaintiff explained in a function report that after school he let the girl into his mother's house (where the girl lived), helped her with homework, and stayed with her until his mother got home. (Tr. at 170.) The girl did not live with plaintiff, and it does not appear that he cared for her for significant periods of time. It is thus hard to see how this activity undercut his credibility. The ALJ also overlooked other important SSR 96-7p factors, such as medications and medication side effects, plaintiff's regular treatment at a pain clinic, and other measures he used to relieve pain. Plaintiff testified that he took various pills, including strong pain pills, which made him drowsy. (Tr. at 49-51.) Plaintiff further testified that he used muscle relaxers and laid down to reduce pain. (Tr. at 52.)

The matter must be remanded for reconsideration of plaintiff's credibility. On remand, the ALJ must consider the entire record and provide specific reasons for her determination, consistent with the requirements of SSR 96-7p.

**B. Medical Opinions**

    **1. Applicable Legal Standards**

The medical opinion of a claimant's treating physician must be given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). If the opinion does not meet the test for controlling weight, the ALJ must decide how much weight it does deserve, considering a checklist of factors, including the length, nature, and extent of the treatment relationship; the frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of

15

the physician's opinion. 20 C.F.R. § 404.1527(c); see also Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011). The ALJ must always offer "good reasons" for discounting a treating source opinion. 20 C.F.R. § 404.1527(c)(2); Scott, 647 F.3d at 739.

The ALJ must also consider any opinions in the record from state agency medical and psychological consultants, as they "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, 1996 WL 374180, at *2. In weighing these opinions, the ALJ must consider the supportability of the opinion in the evidence, including any evidence received at the hearing level that was not before the state agency; the consistency of the opinion with the record as a whole, including other medical opinions; any explanation for the opinion provided by the consultant; and any specialization of the consultant. Id.

### 2. Analysis

In this case, the ALJ noted that in her December 2010 report, Dr. Moss, plaintiff's treating physician, opined that plaintiff could sit or stand for less than two hours during an entire workday, and that he would miss four or more days of work per month. According to the VE, either limitation would preclude work. (Tr. at 74.) However, the ALJ found Dr. Moss's evaluation "inconsistent with the remaining medical evidence." (Tr. at 17.) In support of her determination, she relied on essentially the same rationale as she did in deciding credibility, stating that:

> the objective medical evidence revealed only mild abnormalities in [plaintiff's] spine and knee, and Dr. Hicks noted that [plaintiff] remained able to ambulate effectively. In addition, [plaintiff] reported that he remains able to perform a variety of daily tasks that are indicative of physical ability in excess of that determined by Dr. Moss. Considering [plaintiff's] reported level of activity, the findings of [Dr.] Hicks, and the objective medical evidence, the undersigned finds that Dr. Moss' opinion is worthy of limited weight.

16

(Tr. at 17.)

This is insufficient. First, as indicated above, the record contains objective medical evidence substantiating more than "mild" abnormalities. Second, the ALJ failed to explain how Dr. Hicks's finding that plaintiff could "ambulate effectively" conflicted with Dr. Moss's report. Dr. Moss did not say that plaintiff could not walk or that he needed a cane or other assistive device. (Tr. at 325.) Third, as also discussed above, the ALJ simply listed various daily activities without considering plaintiff's testimony regarding limitations. Nor did the ALJ explain how any of these activities conflicted with any specific portion of Dr. Moss's report. For instance, Dr. Moss did not say that plaintiff was so impaired that he could not play two games of pool once per week.[2]

The matter must be remanded for reconsideration of Dr. Moss's opinion. On remand, the ALJ must first determine whether the opinion deserves controlling weight under 20 C.F.R. § 404.1527(c)(2). If it does not, the ALJ must determine what weigh the opinion does deserve under the § 404.1527(c) checklist. The ALJ must provide good reasons for these determinations.

The ALJ must also reconsider the state agency consultants' reports. The ALJ noted that Dr. Foster found plaintiff capable of medium work with no more than occasional climbing of ladders, ropes, or scaffolds due to his Achilles rupture and obesity. Dr. Khorshidi found plaintiff capable of sedentary work that did not involve even moderate exposure to hazards. In

---

[2]In her brief, the Commissioner questions whether Dr. Moss qualifies as a treating source. The ALJ found that she was, and I may not on judicial review adopt a different rationale in order to affirm. The Commissioner also offers further post-hoc support for the ALJ's rejection of the Moss report, but on judicial review I am limited to the reasons provided by the ALJ.

17

reconciling these opinions, the ALJ compared plaintiff's ongoing complaints of back and knee pain (in addition to the recent surgical repair of his Achilles tendon) with the "mild objective findings," concluding that work at the light level with a sit/stand option and postural limitations was an accurate assessment of plaintiff's maximum remaining ability. (Tr. at 17.) The ALJ did not discuss the SSR 96-6p factors. Nor did she discuss the modest/moderate findings on the April 2010 scans and the neuropathy demonstrated on the EMG and nerve conduction studies. On remand, the ALJ must reconsider Dr. Khorshidi's report in light of this evidence and her reconsideration of plaintiff's credibility.

After reconsidering credibility and the medical opinion evidence, the ALJ must re-determine RFC. In redetermining RFC, the ALJ must specify how often plaintiff must be able to sit and stand. Arnett v. Astrue, 676 F.3d 586, 593 (7th Cir. 2012) ("An RFC must be specific about the required frequency of standing and sitting."). She must also account for any manipulative limitations of plaintiff's right hand. See SSR 96-9p, 1996 WL 374185, at *8 ("Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base.").

Finally, the ALJ must on remand evaluate plaintiff's impairments under the correct Listings. The ALJ evaluated plaintiff's diabetes under Listing 9.08 (Tr. at 15), but that section was deleted effective June 7, 2011. See Cardona v. Colvin, No. CV-11-335, 2013 WL 4041475, at *4 n.3 (E.D. Wash. Aug. 8, 2013). The ALJ must also evaluate the effects of plaintiff's obesity at each step of the sequential evaluation process. See Masch v. Barnhart, 406 F. Supp. 2d 1038, 1048-50 (E.D. Wis. 2005); SSR 02-1p, 2002 WL 34686281; see also Martinez v. Astrue, 630 F.3d 693, 698 (7th Cir. 2011) ("It is one thing to have a bad knee; it is

18

another thing to have a bad knee supporting a body mass index in excess of 40.").

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is **REMANDED** for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 7th day of October, 2013.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge